IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2010 Session

## STATE OF TENNESSEE v. WILLIAM GEORGE SOLLER, JR.

**Appeal from the Circuit Court for Sevier County**
**No. 12758    Jon Kerry Blackwood, Senior Judge**

_____

**No. E2009-01138-CCA-R3-CD - June 9, 2010**

_____

The Defendant, William George Soller, Jr., was convicted of driving under the influence (DUI), fourth offense, a Class E felony. The Defendant pled guilty to violation of the implied consent law (Count 2) and driving on a revoked license (Count 3), both Class A misdemeanors. Following a sentencing hearing, the Defendant was sentenced as a multiple offender to forty months to serve at 35% for the DUI conviction, eleven months and twenty-nine days in the county jail, suspended to five days and the remainder on supervised probation for Count 2, and eleven months and twenty-nine days in the county jail, suspended to forty-five days and the remainder on supervised probation for Count 3. The trial court ordered the sentences to be served concurrently to one another but consecutively to sentences imposed in a separate case. In his appeal as of right, the Defendant contends that (1) the trial court erred in denying the motion to suppress because the officer did not have reasonable suspicion to stop the Defendant, (2) the evidence was insufficient to support his conviction for DUI, and (3) the trial court erred in sentencing the Defendant as a Range II offender. Following our review, we affirm the judgment but conclude that the trial court improperly classified the Defendant as a Range II offender. Accordingly, we remand the case for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part and Reversed in Part; Case Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Ralph E. Harwell and Jonathan Harwell, Knoxville, Tennessee, attorneys for appellant, William George Soller, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; James B. Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

**OPINION**

Officer Matthew Pendleton of the Pigeon Forge Police Department testified that he was working on the night of January 29, 2007, when he received a call regarding a black Cadillac Escalade in the area of the Smoky Mountain Brewery (Brewery). On that night, the air was very clear and there were Christmas lights and street lights lighting the road. On his way to the Brewery, Officer Pendleton saw the Defendant driving a car that matched the description traveling southbound on the Parkway, which serves as the "main road" through Pigeon Forge and is a road that "has three lanes on each side" with one side going north and the other side going south. Officer Pendleton stated that he knew the Defendant prior to seeing him on the Parkway and that he had seen the Defendant when the Defendant was sober and when the Defendant was intoxicated.

On this occasion, Officer Pendleton first observed the Defendant near the "Wears Valley/Parkway intersection." Officer Pendleton was driving northbound towards the Defendant. Officer Pendleton could not tell whether the Defendant's car was the black Cadillac Escalade mentioned by the dispatcher, but he was able to determine that the car was "a large [sport utility vehicle]" that was "traveling at a high rate of speed coming towards [him]" from the direction of the Brewery. The speed limit on the road was thirty-five miles per hour, and Officer Pendleton estimated that the Defendant was driving approximately fifty-five or sixty miles per hour.

When the Defendant approached a "cross-over" on the Parkway, the Defendant "made an abrupt and illegal turn to turn back northbound." Officer Pendleton described the "cross-over" as an area that was "perpendicular" to the Parkway with a "double yellow line" that ran down the middle of the "cross-over." Travelers from both directions may enter the "cross-over" and turn the opposite direction. When at the "cross-over," there is a "stop bar," which marked a safe distance at which to stop in order to turn into traffic. The Defendant did not stop at the "stop bar" before making his turn. In addition, Officer Pendleton described the Defendant's turn as a "very fast unsafe turn." Officer Pendleton continued northbound and followed the Defendant as the Defendant turned right "on East Wears Valley" and continued speeding. When the Defendant approached the Teaster Lane and East Wears Valley intersection, Officer Pendleton turned on his recording equipment and recorded the Defendant's driving "for approximately a mile before [he] activated [his] emergency equipment." As Officer Pendleton was following the Defendant, the Defendant "r[o]de the white line" or fog line approximately three times. Officer Pendleton then turned on his blue

-2-

lights, and the Defendant turned into the Mountain National Bank parking lot. As they were both turning into the parking lot, Officer Brad Lowe of the Pigeon Forge Police Department arrived to assist Officer Pendleton.

Once in the parking lot, the Defendant got out of the vehicle and spoke to Officer Pendleton. According to Officer Pendleton, the Defendant's breath "smelled of an alcoholic beverage," and the Defendant's eyes were bloodshot. Officer Pendleton told the Defendant that he should not be driving, and the Defendant agreed and said, "Yes." The Defendant also asked if he could have his wife come pick him up and pointed in the direction of his house. Officer Pendleton refused and proceeded to direct the Defendant in some field sobriety tests.

Before starting the tests, Officer Pendleton asked the Defendant if there was "anything wrong with his legs or his back or [if he had] medical problems that would keep him from doing the[] field sobriety tests." After indicating that he was able to attempt the tests, the Defendant attempted the nine-step, walk-and-turn test; the one-legged stand test; the A-B-C test; and the finger dexterity test. The Defendant performed poorly on all of the tests except the finger dexterity test. While taking the nine-step test, the Defendant was "unsteady" and lost his balance several times. While taking the one-legged stand test, the Defendant was "unsteady the entire time" and put his leg down before the test was completed. When saying his A-B-Cs, the Defendant did not stop at T, where he was directed to stop. Officer Pendleton then informed the Defendant that he was under arrest and transported him to the Pigeon Forge Police Department.[1] Once at the police department, Officer Pendleton asked the Defendant if he would take a breathalyzer test. The Defendant refused the test and signed the implied consent report indicating his refusal.

On cross-examination, Officer Pendleton admitted that he knew the Defendant had "some enmity" with a Gatlinburg police officer. Officer Pendleton denied that he knew that the Defendant had an inner ear problem or a leg injury. He also denied that he testified at the motions hearing that he did not remember asking the Defendant about possible medical problems. Officer Pendleton admitted that if the Defendant agreed to take the breathalyzer test, the Defendant would have taken the test approximately thirty-five minutes after stopping at the Mountain National Bank. Officer Pendleton then admitted that during that thirty-five minutes before taking the test, the Defendant's blood alcohol concentration would have been rising and would have ultimately been higher than when the Defendant was first spotted on the Parkway after leaving the Brewery.

---

[1]The Defendant's performance on the tests and arrest was videotaped; however, the audio was not working.

Officer Pendleton insisted that it was illegal for the Defendant to not stop at the "stop bar" because the "stop bar" served as a "marker[], button[], or sign[]" and that all turns must be made in a "safe manner." Officer Pendleton admitted that the Defendant was not speeding as he was being followed but stated that he concluded the Defendant was an impaired driver based upon the "whole situation" and the "totality of the circumstances." Officer Pendleton then denied that he stopped the Defendant because he recognized the Defendant.

On re-direct examination, Officer Pendleton stated that he based his decision to arrest the Defendant on the disturbance call he received, the fact that the Defendant was speeding away from a place that sells alcohol, the illegal turn, the speeding, the Defendant's crossing of the "fog line three to four times on Teaster Lane," the Defendant's demeanor and answers to questions once the Defendant got out of the car, and the Defendant's performance on the field sobriety tests.

Officer Lowe testified that he followed Officer Pendleton into the Mountain National Bank parking lot as the Defendant was stopping his vehicle. Officer Lowe got into Officer Pendleton's vehicle and "moved the camera to get a good shot of his position and his field sobriety check." Officer Lowe observed the field sobriety tests and "booked in [the Defendant] after the arrest was made." From his observations, Officer Lowe believed "that [the Defendant] was too impaired to be driving" and that he smelled alcohol when he was near the Defendant.

On cross-examination, Officer Lowe admitted that he was not able to see the Defendant's poor driving because he arrived after the Defendant stopped at the Mountain National Bank. He stated that Officer Pendleton had control of the microphone for the camera system and was the only one able to turn the audio on. Once at the police station, Officer Lowe overheard the Defendant's refusal to take the breathalyzer test.

## ANALYSIS

### I. Motion to Suppress

The proof at the suppression hearing consisted solely of Officer Pendleton's testimony. Officer Pendleton testified consistently with his testimony at trial except that he said that the Defendant's car "shift[ed] to the right side" when the Defendant turned in front of Officer Pendleton.

In denying the Defendant's motion to suppress, the trial court stated,

The [c]ourt finds . . . that the officer is a credible witness. Secondly, the [c]ourt finds that it's uncontradicted that the officer testified that when he first saw the vehicle it was in his opinion that the vehicle was speeding.

The second factor in this case is that, and I agree I don't know whether that stop bar is a violation of the statute or an ordinance or whether or not that in and of itself is a violation of the law, but the officer's testimony was that the turn was made in an unsafe manner after observing the [D]efendant speeding. . . . Secondly, the officer testified that when he got on Teaster Lane, it was his opinion that the [D]efendant was still speeding at that time.

Together with these facts plus the fact that these clues provided him that there may be something wrong with the [D]efendant's driving, while not crossing the fog line is not a violation of law, taking all of these observations, the speeding, the turn, the tilt of the car, these all make for reasonable suspicion supported by articulable facts that the [D]efendant was violating the law, and thus the motion to suppress will be denied.

The Defendant contends that Officer Pendleton did not have reasonable suspicion to stop the Defendant for driving under the influence when the videotape of the Defendant's driving showed "only extremely minor imperfections." The Defendant compares the Defendant's driving to the driving illustrated in the case of State v. Binette, 33 S.W.3d 215 (Tenn. 2000). The State responds that "[b]ased on the totality of the circumstances, [Officer] Pendleton had reasonable suspicion to stop the [D]efendant."

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. Binette, 33 S.W.3d at 217. Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial

court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. Any warrantless search or seizure is presumed to be unreasonable and requires the State to prove by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement. State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). However, a police officer may make an investigatory stop based upon reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed. Terry v. Ohio, 329 U.S. 1, 20-21 (1968); Binette, 33 S.W.3d at 218.

A police officer must have such a reasonable suspicion in order to stop a vehicle without a warrant. State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002). Our supreme court has stated that "when an officer turns on [his] blue lights" a stop has occurred. State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993). Reasonable suspicion is determined by an examination of the totality of the circumstances. Binette, 33 S.W.3d at 218. Circumstances relevant to an analysis of reasonable suspicion include "the officer's objective observations [and any] [r]ational inferences and deductions that a trained officer may draw from the facts and circumstances known to him." State v. Yeargan, 958 S.W.2d 626, 632 (Tenn. 1997).

As an initial matter, we acknowledge that Officer Pendleton said that the Defendant's car shifted, not that it tilted and that the trial court's declaration that the car tilted was not supported by the evidence. However, the evidence presented at the suppression hearing established that Officer Pendleton had reason to believe that the Defendant was driving impaired. The Defendant was speeding, and he made an abrupt turn in an unsafe manner, which caused the vehicle to shift. The videotape also reflects that the Defendant continued speeding, and when on Teaster Lane, the Defendant touched the fog line several times.

The Defendant urges us to compare the Defendant's driving with the videotape submitted in the Binette case. We conclude that this case is materially different from the Binette case in that a majority of the Defendant's driving was not shown on the videotape; instead, Officer Pendleton testified regarding the Defendant's driving prior to the videotape evidence. The trial court specifically found that Officer Pendleton was a credible witness, and we will not disturb that finding. We do agree with the Defendant that touching the fog line would not provide any officer with reasonable suspicion to stop any driver. However, the totality of the circumstances in this case provided Officer Pendleton with specific and articulable facts to support his reasonable suspicion that the Defendant was driving under the influence. Moreover, observing the Defendant drive over the speed limit justified stopping

the Defendant for violating a traffic law. Accordingly, we affirm the trial court's denial of the Defendant's motion to suppress.

## II. Sufficiency

The Defendant contends that the evidence was insufficient to sustain his conviction for DUI because the videotape evidence showed that the Defendant only committed minor traffic errors. The State responds that evidence was sufficient to sustain his conviction because of the entirety of Officer Pendleton's observations, not just the videotape.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not re-weigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The Defendant was convicted of DUI in violation of Tennessee Code Annotated section 55-10-401. The statute states, in pertinent part:

> (a) It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while:

> > (1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing

-7-

stimulating effects on the central nervous system;
or

(2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (.08%) or more.

Tenn. Code Ann. § 55-10-401(a)(1).

In this case, Officer Pendleton testified that the Defendant was driving in excess of the speed limit, that the Defendant made an unsafe turn, that the Defendant smelled of alcohol and was unsteady on his feet when he got out of his car, and that the Defendant failed three of the four field sobriety tests. Officer Lowe testified that the Defendant smelled like alcohol and that he believed that the Defendant was too impaired to drive. Accordingly, we conclude that there was sufficient evidence to convict the Defendant of DUI.

### III. Sentencing

The Defendant contends that the trial court erred in sentencing the Defendant as a multiple offender because his convictions of aggravated assault and aggravated burglary, both Class C felonies, should have counted as one conviction pursuant to Tennessee Code Annotated section 40-35-106(b)(4). Accordingly, the Defendant contends that the trial court should have sentenced him as a standard offender because he only had one prior Class C felony. The State responds that the trial court properly sentenced the Defendant because the convictions should not count as one conviction. The State also responds that the conviction for aggravated burglary "necessarily includes the element of bodily injury by way of incorporating the elements of assault" when the Defendant was indicted for aggravated burglary by assault.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2005). The appealing party has the burden of showing that the imposed sentence is improper. Id. If review of the record reflects that the trial court properly considered all relevant factors, gave due consideration and proper weight to each factor, and its findings of fact are adequately supported by the record, this court must affirm the sentence. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Should the record fail to demonstrate the required considerations by the trial court, then appellate review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169. In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. Tenn. Code Ann. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The Defendant committed this offense on January 30, 2007; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in 2005. The act provides that:

> (c)  The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender.  In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> > (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> > (2) The sentence length within the range should be adjusted, as appropriate, by the presence or

> absence of mitigating and enhancement factors set
> out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2) (2006).

A defendant may be sentenced as a multiple offender if he has received:

> (1) A minimum of two (2) but not more than four (4) prior
> felony convictions within the conviction class, a higher class, or
> within the next two (2) lower felony classes, where applicable;
> or
>
> (2) One (1) Class A prior felony conviction if the defendant's
> conviction offense is a Class A or B felony.

Tenn. Code Ann. § 40-35-106(a).

Here, the Defendant was convicted of a Class E felony and pled guilty to two Class A misdemeanors. The Defendant has two prior felony convictions for aggravated assault and aggravated burglary, both Class C felonies. The prior convictions were alleged by the State to have been committed on the same day. Thus, for purposes of the twenty-four hour merger rule, the convictions will "constitute one (1) conviction for the purpose of determining prior convictions" unless "the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims." Tenn. Code Ann. § 40-35-106.[2]

The Defendant's conviction for aggravated assault includes the element of threatened bodily injury to the victim. However, both convictions must include an element of bodily injury in order for the exception to apply. State v. Horton, 880 S.W.2d 732, 736 (Tenn. Crim. App. 1994). As alleged by the indictment in support of the aggravated burglary conviction, the Defendant was accused of entering a habitation with the intent to commit an assault.

In determining whether aggravated burglary includes a threat of bodily injury, we must examine the statutory elements of the aggravated burglary conviction. Tenn. Code Ann. § 40-35-106(b)(4). Aggravated burglary is a burglary of "a habitation." Tenn. Code Ann. § 39-14-403(a). In order to sustain a conviction for aggravated burglary, the State need only prove that a defendant entered a habitation "with intent to commit a felony, theft or assault."

---

[2]The statute was amended in 2009 to specifically include aggravated burglary as an exception to the rule.

Tenn. Code Ann. § 39-14-403. The statutory elements of aggravated burglary do not include a threat of bodily injury because a defendant must only intend to complete the underlying offense, he need not actually complete the underlying offense. State v. James Carlos Ward, No. M2009-00417-CCA-R3-CD, 2010 WL 1949155, at *11 (Tenn. Crim. App. May 14, 2010). For example, the victim of the aggravated burglary did not have to be assaulted or even be present at the house in order to sustain a conviction of aggravated burglary. Id. Accordingly, the aggravated burglary conviction does not include a threat of bodily injury. Therefore, we conclude that the trial court erred in sentencing the Defendant as a multiple offender because the Defendant's prior convictions should have been treated as one conviction for purposes of the twenty-four hour merger rule. On remand, we direct the trial court to sentence the Defendant as a standard offender.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment is affirmed. The sentence imposed is vacated due to the erroneous classification of the Defendant as a multiple offender, and we remand the case to the trial court for a new sentencing hearing.

_____
D. KELLY THOMAS, JR., JUDGE